May it please the Court, Deanne Maynard for the City of Santa Monica. The City's Quiet Title Act claim is timely and the District Court's decision should be reversed for two independent reasons. First, nothing in the Reverter Clause put the City on notice in 1948 that the United States would someday claim that it could revert title to the City's land, title that the City owned, and second, in any event, the United States abandoned any such claim in the 1984 Settlement Agreement, which came on the heels of a City resolution announcing an intent to close the airport and which comprehensively adopted a plan by which the City would operate the airport until July 1, 2015, and the FAA subsequently confirmed that understanding of the agreement in a Director's Decision that found as fact that after July 1, 2015, operation of the airport was a local land use matter. So I'd like to start with the first point, if I could. You have a, is there an aerial photo that shows this airport, where it's located? There's a, on page 7 of the opening brief, Your Honor, there is a map showing the disputed parcels, but not, in the record I'm not sure there is a photo of the entire airport, but it's important to note, I think, Your Honor, that the airport is situated, and the complaint notes this, describes it, is situated in the middle of a residential area with homes 300 feet from the runway. And the City has brought this to, it's very important to the City, the City has brought this quiet title action to try to resolve the United States' assertion, which it first made in 2008, that if the City didn't operate the airport in perpetuity, the United States could revert title to the City's land. Nothing about the reverter clause in the instrument of transfer would have put the City on notice of such a claim. The reverter clause, by its plain terms, applies only to the property interest transferred by the United States in the instrument of transfer. Let me ask you a question. Yes, Your Honor. I'm curious. Is anybody in the City aware of those dates? Aware of which dates, Your Honor? Aware of those critical dates. Anybody in the City of Santa Monica, any official, the City Attorney's Office, aware of those dates? I'm sorry, I'm not understanding what you're asking me. Aware of which dates, Your Honor? Well, if a date passed, then the property would revert to the federal government. No, Your Honor. That's what the contention is, isn't it? No, Your Honor. So, the United States claimed in 2008, for the very first time, that if the City did not continue to operate the airport forever as an airport, the United States could revert to itself title to the City's land that underlies the airport. But the reversion clause, by its plain terms, only entitles the United States to revert property interests that the United States itself owned and transferred to the City. But it's undisputed that the United States has never owned the land. The land that is used... I thought, you know, I'm trying to understand exactly what happened here. So, the government, the government during the war... The United States government? Yes. As part of the war effort, needed or wanted or desired local airports to help with the war effort. Right? That's correct. And apparently, there was some existing rough runways or something. Very basic. There was an airport there. Yes, Your Honor. And the government worked out a deal with the City for the government to use that land. Is that right? Is that what... That's right. The City leased two parcels of land to the government, what we call the runway lease and the golf course lease, on very favorable terms. Right. But that's understandably so, right? To support with the war effort. But at the time, most of the land... Now, let me ask you this. At that time, was there a neighborhood around this area? There was... Was there housing and all that? At the time of the war? I don't think that's in the record, Your Honor, but it's certainly... It's now, it's 60 years later, it's more developed today. No, but I'm talking about the time that this was... The time when this was done. There were some structures at the beginning of the war. Okay. So, I just want to make sure... It was contemplated, was it not, that as part of the government taking over using this land, they would build it out? In other words, they would put a bigger runway and all that kind of stuff? The leases had different terms in that regard, Your Honor. One of the leases provided that the United States could make improvements and then would leave the improvements. The other, the golf course lease, initially provided that the United States had to return the land to its original condition, so it could build improvements, but had to return the land. Pursuant to a subsequent amendment to that lease, before the instrument of transfer, that's that issue here, the city and the United States entered into an amendment to that lease whereby the city relieved the United States of its obligation to restore the land to its original condition. The golf course land? Yes, Your Honor. Okay. In exchange, the United States transferred a lot of the property that was on the land to the city and also paid the city $150,000 as compensation for being released from that obligation. Is there anything left of the original improvements prior to the time that the instrument of transfer was executed? It is the city's... That is of any value? It is the city's position that none of the improvements that were actually transferred by the United States to the city have any remaining useful life. It's now been more than 60 years since the transfer, and we asserted that in our opening brief. The United States doesn't contest it. That, Your Honor, I think is a merit... What happened to the runway that the government built? The runway that the government... Again, that's not in the record. My understanding is the runway has been improved and replaced over the years since. It's been a long time since the 1948 instrument of transfer. Again, this is a merits question. What the city would like, we're here before the court appealing a jurisdictional dismissal because the district court decided incorrectly that the city was time barred. We would like to go back to the district court and resolve on the merits because the United States is essentially wanting to have its cake and eat it too here. They want to say, don't worry about the merits. We don't have to reach... You don't have to decide, Your Honors, whether our position on the reverter clause is right or not. Just affirm the district court's jurisdictional dismissal, and then we can keep this sword of Damocles hanging over the city's head and say, well, but if you stop operating this airport, we have the power to take your land, even though we think that the plain name of the clause can't possibly mean that. I'd like to know what's really going on. I was born in this city, and here the Grand Zeppelin landed, I remember that, Miles Field, a lot of other things. That's why we're asking you these questions. Yes, Your Honor. They just want us to focus on some little thing, and we've got the world out there, too. I think that's a very good point, Your Honor. I'll tell you what I think is really going on if you step back from it. The United States, the FAA, wants the city to continue operating the airport. The city wants the power, as a government, to decide what to do in the best interest of its citizens with its land. The United States is faced with the prospect of the grant authorizations, the money that it's provided, the contracts, expiring or, in our view, already expired. And they have now come forward with a new threat. The first time they made this claim was in 2008. They are now reading the instrument of transfer in a new way, and they are saying the reverter clause in the instrument of transfer city, if you stop operating your land as an airport, will allow us to take title to the city's land. That is a new claim that they first asserted in 2008, and the city has now come to the federal courthouse under the Quiet Title Act, which is the provision that allows resolution of such disputes against the United States within AMP. You just said the federal government wants to operate an airfield there? No, Your Honor. I think that the FAA would like for the city to continue to operate the airport. And so the FAA is taking the position, and they took it for the first time in 2008, that if the city doesn't operate the airport on its land forever, the United States can revert the city's land, title to the city's land, to itself. I thought the land was all clear. Is there a runway still there? There's an airport still there today, Your Honor. That's the Santa Monica Airport is the center of this dispute. And the land underneath that airport has always been owned in fee simple, throughout World War II, at the time of the instrument of transfer, and today, by the city of Santa Monica. There is no way the reverter clause, all it says is that the United States can revert the property interest it transfers to the city if it determines there's a violation of the obligations in that agreement. And there's no way just the language of that agreement put the city on notice in 1948 that it needed to challenge the claim the United States is making now. Nor would this court want to hold such a rule. In fact, this court has repeatedly said, in multiple cases, that just because you know the United States claims some interest in a land does not trigger a quiet title action and doesn't require you to sue. It's only when there's a dispute about the title, and a new dispute about the title arose in 2008 when the United States first asserted that it could revert title to the land. How again was the city notified that that was the government's intent, FAA's intent? It was a show cause order. It's at ER 99 in the record from the FAA. I just can't remember all the details in all these cases. You have had a long day. I can totally understand that. It's at ER 99 and where the government in an FAA show cause notice in another dispute said that the city has to operate the airport in perpetuity or the United States has the power to revert the airport. So let me ask you this. This was decided under 12B1, correct? That's right, Your Honor. And under 12B1, you're not limited to the allegations of the complaint. That's right, Your Honor. You can look outside the complaint. Although the district court did not make any factual findings. And so there's two principles that are relevant here. One is because it's a jurisdictional dismissal under the Quiet Title Act, if the court feels like there are any facts that would be relevant to this decision, it should send it back. And two, to the extent that here the notice question is inextricably intertwined with the ultimate merits, that too is a basis in Quiet Title Act jurisprudence to send it back to the district court so that we don't get kicked out, which is right now we're kicked out on the jurisdictional issue. So let me ask you. So the notice, on the notice issue, it's that you could interpret the doc, the documents could be interpreted to say that the city had long had notice of the government's position regarding the reverter clause. Or that the reverter clause itself put the city on notice. So there's two points about that, if I may. The reverter clause itself could not have put the city on notice of the extraordinary claim the government is making now. Because the reverter clause itself, and the relevant language is at ER 352, says, the title, right, or possession, and all other rights transferred by this instrument. So why doesn't title refer to the land? Because the title of the land was not transferred by this instrument. The title of the land has always been held by the city, and the government, the United States does not contend otherwise. Other title was passed. So in the instrument, the title still does work here. It was, there was title to the ping pong table, there was title to the improvements, other title was passed, and it would apply to that, but not title to the city's land. So the fact of this, and the city's understanding of this clause is consistent with the plain meaning of revert, which means to take back something that you previously owned, which the United States has never owned, title to the city's land. It's consistent with- Well, Your Honor, today, it's the city's position, as I was discussing earlier, that there is nothing left from the 1948 transfer that has any value. And so there is nothing left to revert under this agreement. And that's part of this case, too, and if we could go back and decide the merits in the district court, that could be decided. So tell me again how the merits resolve the jurisdictional question. The merits are just, well, I think this court can hold that, and the city's first position here is, there was no notice to the city until the 2008 statement that the United States claimed that it could revert title to the city's land. And it's, so back to the second part of your previous question, Your Honor, this case law, court's case law is clear that it's not enough to know that the United States has some interest in the land. You know, consistent interests between the two parties do not trigger a quiet title action. What triggers a quiet title action is, as this court's made clear in Michel, in both of the Leys-Noirs cases, is when there's a dispute that arises as to the title. And it was a new dispute in 2008 when the United States asserted the city had to operate the airport in perpetuity or the United States could revert title to the land. So I'm well past my time. When was, when were operations ceased on that property, air operations? Well the Santa Monica Airport is still an operating airport today, Your Honor. It's sort of like a general, low-level general aviation? It's a general aviation airport. What level is it? I'm sorry, I don't know what you would call it. But it is an operating, it's in operation today, Your Honor. And so one other question you asked me, Judge Paez, I didn't directly answer, is none of the city's previous positions, none of the things that the United States points to, the city attorney's opinion in 1962, all of those, none of those suggest that the city had any that the United States claimed it could revert title to the city's land. The underlying title, the fee title. Fee title to the city's land, none of them. All of them are consistent with... How about the buildings, the runway, and all that? Well the buildings, and so the record is not precise at this point in the current state as to what exactly transferred, what improvements and facilities exactly transferred in that those facilities, Judge Pragerson, the United States would have had a right to revert under the clause. And that explains all of the opinions. It explains the 1952 release, it explains the 1954 release, it explains the 1962 city attorney opinion. But you said that there's hardly anything left, that there's nothing left that is of any value, because over time, I'm assuming the condition of all of the improvements has deteriorated. Right. And so today, Judge Nguyen, the city's position is there is nothing left to revert under the instrument of transfer. In this document, I mean, and our second position is that the 1984 agreement settled any remaining claims about this agreement. The city adopted a resolution intending to close the airport when feasible. They adopted that in 1981. That resulted in a lot of disputes that were resolved by the 1984 agreement between the FAA and the city, whereby the city agreed to operate the airport until July 1st, 2015. That date, and the FAA has since indicated to the city that, as I noted at the beginning in the Director's Determination 2000, that after July 1st, 2015, operation of the airport would be a local land use matter. And so it is the city's first position that nothing in the instrument of transfer gave the city notice of this extraordinary claim. And so our suit is timely, because it's triggered from 2008. But even if you thought otherwise... I missed some words that you used. That operation of the airport would be something, something mattered. Yes, Your Honor. So what I'm referring to is a Director's decision by the FAA Director in 2000. And it's the Santa Monica Airport Association. It's at 2000 Westlaw 1824463. And this is what the Director says. The settlement agreement makes clear that the city is obligated to operate the airport only for the duration of the agreement, that's the 1984 agreement, through July 1st, 2015. And then I'm going to skip a sentence, I'm going to read the language you were asking about. I'm going to skip a couple sentences. To the extent that the complainants seek to prevent the future closure of the airport or require the city to operate the airport beyond July 1, 2015, that is a local land use matter. In other words, the instrument of transfer does not require the city to operate the airport in perpetuity. And this represents, combined with the 1984 agreement, an abandonment of any suggestion that the United States had another claim and restarted the clock. We don't think the clock ever started before, but it's our alternative position. Mary. I'll give you a minute. If the states could come in and just exercise its right to eminent domain and buy it. Well, that would be a different fork in the road, Your Honor. But if we could have our quiet title action decided, and if it were decided on the merits in the city's favor. I'm just talking to you. Yes, Your Honor. And that would be, I think that's a great question for the United States as counsel. Okay. I appreciate your logic. Counsel to the government. You're flying low to the ground. May it please the court, Elisa Klein for the United States. Well, I'd like to focus on the precise statute of limitations issue. I don't believe this case involves any disputed principles of law. The issue is just the application of the settled legal principles to the record in this case. So help me understand something. As of 1948, when the instrument of transfer was negotiated and executed, the United States did not own the land, right? This parcel. Right. And so it had substantial improvements on the city-owned land that it made, so it had an interest in those lands. So it made sense to basically negotiate some sort of a transfer of the right to use the improvements as airport property. But how can the United States transfer a right to repossess the land in perpetuity if it didn't own the land in the first place? Okay. I will answer Your Honor's question, but I should emphasize that I want to distinguish the notice issue from this response, which pertains to the merits, not the notice. Well, you're going to answer the question? Yes. Okay. Basically, what was transferred at the request of the city was a substantially improved airport, more than a million dollars of improvements, for no payment by the city. And the consideration was the acceptance of certain restrictive covenants that explicitly run with the land. In essence, the commitment that this land will be used for airport purposes and run with the land means in perpetuity. And just if the Court wants to look at it. But you're interpreting the transfer of the title as the title to the land, right? At this point, pretend there is no reverter clause, because I think there's no need to address the reverter clause to understand that the city has had notice of the cloud on its title, an adverse interest of the United States since 1948, and subsequently confirmed along the way. So again, if the Court looks at Record XR page 3, where the District Court is quoting the instrument of transfer, not the reverter clause, the paragraphs preceding it, by acceptance of this instrument, the city agrees that the aforesaid surrender of leasehold interest, various structures, et cetera, shall be subject to the following restrictions, which shall run with the land. And then it goes on to enumerate them, including... It doesn't say covenants running with the land. There's restrictions. Yes, but those are restrictive covenants. And that, under this Court's precedent... I haven't had that come up since the bar exam. I had the same feeling, Your Honor. But again, the District Court quotes the relevant law on page 10 of its opinion, including this Court's Michel decision on which the city relies. If, as here, a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period. And that's reiterated in Kingman Reef by this Court. And here, there is no question that restrictive covenants, covenants that run with the land, are a cloud on the title. If a real estate developer were to inquire about purchasing this property and look up the deed, it would see there is an encumbrance. And the relief that's sought in this case, which is record excerpt page 310, is a declaration that the city has unencumbered title and goes on to say that the United States cannot assert in any forum any restriction on the use of the property. So even without regard to the question of remedy, what would happen if down the road the city were to breach the restrictive covenants, there is a cloud on this title that has been... the city has been of notice of that cloud since 1948. It's reflected in the 1984 settlement agreement where the city asked and received a release of specified parcel of land, the park land and residual land from the restrictive covenants. Well, there's a cloud on the title if the Court accepts your interpretation as to how to construe the instrument of transfer. And then, you know, the parties are fighting so much over the appropriate interpretation as to the terms utilized in this document and the subsequent conduct, whether that changes the situation and the settlement agreement and what it covered, what it didn't cover. Doesn't that suggest then that the merits in this case are inextricably intertwined with the jurisdictional issues such that the Court needs to figure out what the merits are? No, Your Honor, because the only question is whether the city is now saying there are no restrictive covenants on the land. And so the only question is, did you know that the United States disagreed? And if you read the instrument itself, not the reverter clause, the instrument, it says there are restrictions that run with the land. So that's, I mean, that means in perpetuity. That's what a restriction is that runs with the land, and one of those being the land has to be used for airport purposes. So in your view, in the government's view, the city's quiet title claim or action, the right to bring a quiet title action, expired years ago. To be precise. Is that right? Well, it's even more than that because as in the Supreme Court's block decision, this claim is so old that it could never have been brought under the Quiet Title Act of 1972. And the Supreme Court discusses the Justice Department insisted on a 12-year statute of limitations so it wouldn't be faced with affirmative litigation over stale claims. Now, to be clear, as the Supreme Court also emphasized, a ruling that in our favor on the statute of limitations does not address the underlying title dispute. So that dispute remains if the United States ever were to take enforcement action against the city, the city could make all its arguments as a defense. How would that evolve? What would the government have to do? I mean, the Supreme Court in block, which was addressing a parallel situation, indicated that it was California could continue to assert its title and then perhaps provoke the United States to bring its own quiet title action. But you could also just imagine restrictive covenants are typically enforced through injunctive action. So, again, this is totally hypothetical because we don't have a breach. So what if the city said in response to this OSC that they got from the FAA, what if they said we're not going to operate this airport anymore? What happens then? We're shutting it down. Then there would be a decision that it would have to be made by the relevant officials in the federal government. This is hypothetical. It would be at the option of the federal government. I'm trying to follow up on your point, though. If one possibility would be a lawsuit for injunctive relief to enforce the restrictive covenants. But I'm not saying that will happen. Just saying if that happened, the city could say these covenants, restrictive covenants, I know they're in there, but they're not valid. They're unconstitutional. Whatever their arguments are today, they can make if this ever happens down the road if the United States brings an affirmative action, which was the point that the Supreme Court was making in Block. What they can't do is use this mechanism, the Quiet Title Act of 1972, to bring claims that accrued more than 12 years before the suit. Those restrictive covenants, they run in perpetuity? Yes, Your Honor. They explicitly run with the land, which means regardless of ownership, the restrictions attach to the land. I know that. Well, we had a lot of restrictions that run with the land in this city and throughout the country. Who could own property? You couldn't sell it to this group or that group. They couldn't live there. So those have been, as we know, back in the 40s, declared to be unconstitutional. Yes, Your Honor. Race-based restrictive covenants are void as against public policy, but there are many types of restrictive covenants like property to be used for church purposes or charitable purposes or not for commercial purposes. I mean, those are all routinely enforced. That's not void against public policy. So if the city stopped using that property for an airport, then the covenant would remain, and anyone who wanted to acquire that property would take subject to that covenant. Which is an encumbrance and which is why. Well, I understand. I think we may be agreeing. Did you say yes or no? Yes. Yes, and that's why the prayer for relief, which is declaring that the city has unencumbered title to airport property, that's too late in the game to bring as a quiet title action. To the extent there's a dispute, it will have to wait for what is hypothetical, but an enforcement action by the United States. If I may briefly address the second line of argument, which is that the 1984 agreement relinquished the city from the land, the entire land from its Surplus Property Act restrictive covenants. That's not correct. The specific provision of the settlement agreement, which is Section 6, and we cited in our brief, released only a specific parcel of land designated as parkland and residual land on a map that was attached to the settlement agreement. The fact that the settlement agreement expired in 2015 is true. It's undisputed, but the settlement agreement was just a 30-year plan. It did not address what happened after 2015. It has a provision that specifically limits the scope and duration of the agreement to 2015, and that's why the district court said this didn't say you shall operate the property only until 2015. It was you've agreed to operate the property until 2015 as an airport and various other provisions of the settlement agreement. Then the slate is wiped clean, and the party's rights are all preserved. The use of the word revert is a misnomer. In this context? Because the question, again... Is that yes or no? Yes, because... So who drafted that provision? It's not a misnomer in the sense that the federal law, the Surplus Property Act, and the implementing regulations, Regulation 16, allowed the FAA to attach conditions to the transfer of surplus property, including leaseholds. Who put the word revert in there? Your Honor, I don't know who specifically put the word in in 1948, but I do know that... Well, you have to know who drafted it. Don't we keep records? Well, in 1948... Did the federal government...? We know that it was signed by both parties. But I'm not prepared to speak to who wrote the word. But the point, again, is it doesn't matter whether you think about the remedy as reverter or something else. For limitations purposes... I know that, but whoever wrote it didn't know what they were saying. They were stupid, you know? So here we are today. This language appears in possibly hundreds of airport surplus property deeds, so I'm reluctant to say it was stupid. Perhaps another word might have been used instead. But again, just to close off, because the final point, which is this reference to a 2,000 directors determination, the quote read is accurate, but the director is just an initial decision maker and did not have before him the question of the instrument of transfer or surplus property agreement. It wasn't in the administrative record, and it was... So even... He has no authority to release an airport. Not stupid, sloppy. It was a passing sentence that didn't matter such that it fell out of... By the time it got to the final agency decision maker, the associate administrator correctly said the 1984 settlement agreement provides a conceptual blueprint for 30 years, not that after that the airport can close. That was not said by the final agency decision maker. This may not be part of the record, but I'm just kind of curious. What's the interest in the FAA in this particular airport? This airport, and I believe this court's prior decision involving the Santa Monica effort to ban Category C and D refers briefly to the use of the airport, which is as a reliever airport for congestion at LAX, which, as the court may know, is one of the most congested airports in the country. So it does play a vital role as a reliever. For smaller aircraft. Smaller aircraft, yes. And the D.C. Circuit, which reviewed the 2009 final agency decision arising out of the same dispute, talks about this issue in greater depth. Okay. Thank you. Thank you, Your Honor. If I could, I'd like to try to make three quick points. The first is the government is trying to disavow the reverter clause here, but that is the sole basis of the district court's decision holding the Quiet Title Act claim untimely. And the reverter, the government's assertion that it can revert title to the city's land is based solely on the reverter clause and is itself a distinct distinction. that first arose in 2008, regardless of whatever the runs with the land provision means. The runs with the land covenants that do not give the city notice that the government could revert title to the city's land. Now, it's a merits question, I think, that should be left for remand, and I think, Judge, you're right, that you could look at these two things as inextricably intertwined and send them back. But the city does not agree with the United States' assertion that the covenants meant that the airport had to be operated forever. The covenants, just like the reverter, only apply to the property that's actually transferred. And that's clear if you look at the two provisions that counsel's referring to that are quoted in the district court's opinion on ER-4, where it's clear that the obligations to operate as an airport apply to the lands transferred. The only land interest transferred here was a lease interest. You can get release from that obligation by asking the FAA, but that release also only applies to the property that's been transferred from the government, and that makes sense. The obligations are the mirror image of the reverter clause, which allows the United States only to revert property that's been transferred. Judge Pregerson, the United States wrote this agreement. They used revert. The plain meaning of revert means you can only get back what you started with. They never have that. See, you're talking too fast. I'm sorry. You're looking at me, and you're giving me a message. Okay. You ask a question. I didn't grow up in this age. Sorry, Your Honor. laughter It's a southern trait. No, no, it's not a thing. No, I'm talking to them. Southern people talk slowly, and they have that nice drawl, you know. I was answering the question you asked. The United States drafts this agreement. The word revert means what it means, and they can't change it now. They needed to have started with title to revert title. They didn't start with title. They never had title. They can't revert it. Ms. Kline argued...  is that the city had noticed that there was a cloud on their title. No, Your Honor. Long ago. No, Your Honor. Not in the meaning required to trigger the statute of limitations. It's not enough to know that the United States has some interest. So to be sure, the requirements and covenants applied to the land that the United States transferred to the city, and the city knew that, and the United States knew that. But as Your Honor suggested, the city, why would the city bring a claim on that? We agreed to that. That's part of the agreement. What created a dispute that triggered a quiet title action is when the United States claimed in 2008 that the city had to operate even property the United States didn't transfer. Ms. Kline also suggested that you could raise these claims about the title and whatnot and some affirmative action that the government might bring if the city decided, look, we're through with this airport. We're going to decommission it. Right. And she's correct that with a jurisdictional dismissal, that's how it works. But that's the sort of damocles that the FAA wants to hold over the city. Well, I mean, you know. But except that, the purpose of the waiver of sovereign immunity in the quiet title is so that parties in the position of the city here don't have to subject themselves to having to wait to raise it as a defense. And as long as we've timely sued, which the city has, the city has timely sued since being put on notice of the relevant title dispute, then the quiet title action allows it to be settled in an orderly way without having to risk what the government is suggesting. Well, the city's position is that there was a restriction, a covenant, that property would be used for an airport, that that only covered part of the overall property. Just part of it. Yes, Your Honor. And not the rest. And your argument is that that covenant that's over part of that property  that that expired too. Yes, Your Honor. That's exactly right. The covenant only applied to the property that the United States actually transferred to the city, and that that property no longer has any meaningful value, that its useful life has expired. And so the covenants no longer have any force. What property is that? What property is useful life expired? The property transferred were buildings, facilities, runways built during World War II, Your Honor, over 60 years ago that no longer have useful life. Well, it's a covenant that runs with the land, not with the buildings. But that just begs the question of what the covenant is. So if the covenant was only to use the property actually transferred for airport purposes, and if that property actually transferred no longer exists, then the covenant that's running with the land has no... There's nothing to apply the covenant to. And that's why... You're telling us there's a covenant that runs with the buildings? Is that what you're saying? I'm saying that the covenant only required the city to take action with respect to the property that was actually transferred. And I think it's very clear from subparagraph 6 of the covenants, which is produced on ER4 of the district court's opinion, where it says that no property transferred by this instrument shall be used, leased, sold, etc. by the city for other than airport purposes without the written consent of the administrator. The covenants only apply the property actually transferred. They're the mirror image of the reverter clause. I mean, it makes perfect sense. But again, these are the merits, and these are the merits we're trying to have settled in the suit. Yes. Thank you. Very interesting case. May I please tell Judge Pragerson that the SMO is a general aviation airport, and currently there are approximately 80,000 takeoffs and landings annually. Say that again. The Santa Monica Airport is a general aviation airport, and currently there are approximately 80,000 takeoffs and landings annually. I know that. Okay. My son used to fly in and out of it, and I know that a lot of people... Why should I let you answer the question you asked me earlier? I asked the question. Oh, sorry. That's all right. It's all right. Thank you. Thank you, Madam. Thank you, counsel, very much. Safe trip back to D.C. And that ends our session for the day and the week. Thank you.
judges: Pregerson, Paez, Nguyen